CARLTON SHIELDS

*v.*

CHURCH BROTHERS, INC.,
*a corporation*

(No. 13097)

Submitted October 10, 1972.    Decided December 12, 1972.

*Hudgins, Coulling & Brewster, Harold D. Brewster, Jr., D. Grove Moler,* for appellant.

*Harry G. Camper, Camper & Watson, James C. Lyons,* for appellee.

KESSEL, JUDGE:

This case is before the Court upon an appeal to the judgment of the Circuit Court of Wyoming County in an action instituted by Carlton Shields, as the plaintiff, against Church Brothers, Inc., a corporation, as the defendant, to recover for personal injuries sustained by the plaintiff when a bulldozer, operated by an employee of the defendant, struck a log which caught on a stump, causing the log to "whip" and strike the plaintiff on the right leg, fracturing the tibia and fibula of the plaintiff's leg. The jury returned a verdict against the defendant and in favor of the plaintiff in the amount of $940.88 "to cover Wyoming General Hospital bill only". Upon a motion for a new trial made by the plaintiff, the trial court set aside the jury verdict and granted the plaintiff a new trial on the sole issue of damages. It is from this order of the trial court that the defendant was granted an appeal.

The defendant assigns the following errors: (1) that the trial court should have directed a verdict for the defendant at the close of the plaintiff's evidence or at the conclusion of all the evidence upon the ground that the evidence established, as a matter of law, that the defendant was not guilty of any negligence which proximately caused the plaintiff's injuries; (2) that the trial court should have directed a verdict for the defendant at the close of the plaintiff's evidence or at the conclusion of all the evidence for the reason that the evidence disclosed that the plaintiff, as a matter of law, was guilty of contributory negligence which proximately contributed to the accident and his own injuries; (3) that the trial court should have affirmed the jury verdict as a verdict in favor of the defendant perversely expressed; and (4) that, in the alternative, the trial court should have granted a new trial on all issues and not solely on the issue of damages.

Carlton Shields, the plaintiff, was employed by Eastern Gas and Fuel Company to clear a parcel of land, containing

5.89 acres, in order that the company might use the land as a tipple site. The tract of land was partially level bottom land and partially hillside. Under the terms of the oral agreement entered into by Eastern and the plaintiff, Shields was to cut the brush on the tract and burn it and cut the trees into prop timber and saw logs for use in the mine.

The plaintiff employed several men to use hand tools in clearing the land. Prior to the time of the accident the brush and trees had been cut and the brush and unusable timber had been burned. In order more quickly to clear the land of the logs which remained, the plaintiff rented a bulldozer with an operator from the defendant. The bulldozer operator, William Shiflett, was instructed by the defendant merely "to move the dozer for Carlton Shields".

On Saturday evening before the accident, the bulldozer was delivered by truck to the tipple site, but the work did not commence until the next morning. On that same evening, the plaintiff discussed with Shiflett where the logs were to be piled so that they could be picked up by trucks at a later time.

On Sunday morning, the day of the accident, the plaintiff and three of his employees met Shiflett at the tipple site. Shiflett drove the bulldozer to a place where some logs had been cut and proceeded to instruct two of Shields' employees how to hook the logs to the chain attached to the bulldozer. While the logs were being hooked to the bulldozer, the plaintiff walked down through the bottom to pick out the exact place where the logs were to be worked up into saw logs. When the plaintiff found the place where he wanted the logs to be piled, he waited there for Shiflett to finish hooking the logs and haul them through the bottom.

In the area where Shields was standing, there were several logs and poles scattered around. Shields, who testified that he had about ten years experience bulldozing

and had been a timberman since 1961, gave the following account of the accident upon cross-examination:

"Q. You saw him coming down through the field approaching you with his blade down, didn't you?

A. Yes, sir, occasionally he would knock one out of the way, yes, sir.

Q. As he was coming through there with his blade down he was hitting logs and stumps and logs were lying there and he would hit them with his blade, and as the blade hit them they would come around so they would be lying parallel with the path in which you were traveling, isn't that right?

A. That's right.

Q. And you also know, based on your experience as a bulldozer operator, that it is possible when doing this type of work where there are logs and stumps, that if one of those logs would happen to catch as it is moving around, would happen to catch on a stump, it would get some whip action to it?

A. It is possible, yes.

Q. And there were some stumps and some logs in the area where you were standing, isn't that right?

A. Yes, sir.

Q. And you knew, based on your experience, that when you went through the area where you were standing that it was entirely possible he might hit a log and could whip around and hit you, is that right?

A. That is possible. That is why, after I showed him where the best place was for the logs, I turned around and started walking off.

Q. Mr. Shields, about how far were you from the dozer when you went by it?

A. I would say I was around twenty to twenty-five feet more or less.

Q. You were standing there, I believe — Didn't you say you were standing there and the dozer was coming toward you making this run?

A. I was standing there and watched them hook on the logs over there across the creek. I stood right there and watched him come through. He opened his road up the first trip he went across through the creek, and I was just more or less interested in how he was going to come back through there, and I just stood there and watched him as he came down through there, and he approached me to where he looked at me. I took my arm and pointed down like this, and he shook his head o.k. Well, I turned around and walked back. I was watching the boys skid some logs off of the steep place over there to the right and I maybe made a step or two, and the next thing I knew I was on the ground."

Shiflett, the bulldozer operator, testified that, after hooking six or seven logs on the chain, he proceeded to drive the bulldozer some three or four hundred yards to the place the plaintiff had selected for the logs to be piled. According to Shiflett's testimony, he was proceeding as slowly as possible and would look back every once in a while and then look ahead. As he approached the site where the logs were to be piled, he had his blade down so that he could knock the logs out of the way and make a road.

Both the plaintiff and Shiflett testified that they thought Shields was a reasonably safe distance away from the bulldozer when the accident occurred. Both men were experienced bulldozer operators and were aware of the possibility that the bulldozer could strike a pole and cause it to "whip out". The plaintiff testified that, based on his own experience, it was possible for the bulldozer, as it went through the area where he was standing, to strike a log which would whip around and hit him. At the

time the bulldozer passed Shields, it was twenty or twenty-five feet away from him.

Shiflett testified that he did not see the pole which hit shields and that a safer course of action would have been to make the road before any logs were hauled.

The plaintiff further testified as follows:

"Q. Mr. Shields, did you feel that you were standing a little too close to that dozer?

A. No, sir, I didn't feel I was standing too close to it.

Q. You felt you were a reasonably safe distance away?

A. I would have felt so.

Q. Then Bill Shiflett would have felt you were a safe distance away, wouldn't he?

A. It would be possible, yes.

Q. Then he wouldn't be thinking about raising his blade to miss a pole because he would have been a reasonable, safe distance away, isn't that right?

A. That could be possible too, but I am referring to the poles that might have been caught by the blade and swung around or something or maybe jumped when it was hit by the dozer.

Q. Of course, Mr. Shields, if Mr. Shiflett saw that he was hitting a pole and he saw this pole swing around to hit you, then I assume that he would stop the dozer, wouldn't he?

A. I would think a man would try, yes, sir.

Q. Based on your experience as a dozer operator, when you are going through this type of terrain moving poles, moving them out of the way, if a man was off twenty to twenty-five feet out of your way, then you feel he would be a reasonably safe distance away, isn't that right?

A. I would feel that he would be. It more or less depends on how long the poles are, yes.

Q. When you are going through there making a road, which you have been doing, then your job is to hit poles in front of you and move them out of the way, isn't that right?

A. Yes.

Q. So that is exactly what Mr. Shiflett was doing this day, hitting these poles and moving them out of the way, isn't it?

A. Every now and then, yes.

Q. And that is exactly what you would have expected him to do that morning, isn't that right?

A. You would have to put your blade on a pole in order to get it out of the way, that's for sure.

Q. So when he hit this particular pole and moved it, he was doing exactly what he was supposed to do and what you would have anticipated him to do, isn't that right?

A. I didn't anticipate him hitting the pole and hitting me, no.

Q. No, sir, I know you didn't anticipate you getting hit, and I don't think anybody else did, but my question is, when he hit the pole in the first place, he hit the log, that is exactly what he was supposed to be doing, hitting the poles in front of him, and obviously this pole was in front of him or it wouldn't have been hit, is that right?

A. That's right.

Q. So he was doing exactly what he was supposed to be doing when he hit this pole and moved it around, isn't that right?

A. Yes, sir.

Q. And it just happens that it, unfortunately, caught a stump at the wrong angle and hit you, isn't that right?

A. Yes, sir.

Q. And this is one of those accidents that happen in this type of work, isn't that right?

A. You hear of it occasionally, yes, sir."

As a result of the plaintiff's accident, he sustained a fracture of both bones in his lower right leg and was hospitalized for approximately three weeks. He wore a cast on his leg from the time of the injury in October, 1966, until it was removed in April, 1967. For most of the remainder of the year in which the cast was removed, Shields had to use crutches.

After the injury, the plaintiff developed dermatitis on his leg and in the groin area, a condition which responded to treatment but was still present to some degree at the time of the trial. As a result of this skin condition, Shields made fourteen trips from his home in Baileysville to Beckley, a distance of 52 miles, to see Dr. McLean, a dermatologist. In addition he made 25 to 30 trips from his home to Mullens, a distance of 26 miles, to see Dr. Newman. As a result of his injury, the plaintiff incurred a hospital bill in the amount of $940.88 and purchased a hospital bed for $100. He did not testify concerning the expenses incurred by him in making the trips to see the two doctors. He did testify, however, that he spent approximately $3.50 to $4.00 each day for his meals when he made trips to see the doctors.

Counsel for the defendant contends that either both the plaintiff and defendant were negligent or that neither of them was negligent. In this connection, counsel for the defendant maintains that the trial court should have directed a verdict for the defendant at the conclusion of all the evidence.

We have carefully reviewed the evidence in this case, and much of the evidence from the viewpoints of the

plaintiff and of Shiflett, the operator of the bulldozer, has been detailed in this opinion. This Court has held repeatedly that questions of negligence and contributory negligence are for the jury, when the evidence is conflicting or when the facts, though undisputed, are such that reasonable men may draw different conclusions from them. *Barker v. Hawkins,* 153 W.Va. 828, pt. 2 syl., 173 S.E.2d 79; *Villers v. McClung,* 153 W.Va. 449, syl., 169 S.E.2d 753; *Yates v. Mancari,* 153 W.Va. 350, pt. 1 syl., 168 S.E.2d 746. We believe that the evidence in this case is sufficient to require submission of the issues of negligence and contributory negligence to the jury under proper instructions.

Counsel for the defendant also contends that the jury verdict should have been affirmed by the trial court as a verdict in favor of the defendant perversely expressed and judgment entered thereon, or, in the alternative, a new trial should have been granted on all the issues and not solely on the quantum of damages.

At the close of all the evidence the court gave the jury eleven instructions, one of which was as follows:

"The Court instructs the jury that if you believe by a preponderance of the evidence that the plaintiff, Carlton Shields, is entitled to recover a verdict, then in assessing the damages that he is entitled to recover in this action, you may take into consideration the following items, if you believe from a preponderance of the evidence the said items have resulted to the plaintiff:

" (1)  Any and all bodily injuries sustained by him and the extent and duration of said bodily injuries, if any; as a direct and proximate result of the blow to his body and legs;

" (2)  Any injurious effect the bodily injuries, if any, sustained by Carlton Shields have had upon his health and comfort, their degree and probable duration and permanency, if any;

"(3) Any and all physical pain, if any, which Carlton Shields has suffered, any bodily discomforts he has suffered and any mental anguish or anxiety he has had since he was injured, or may have in the future by reason of said injuries, if any;

"(4) Any and all doctor, hospital and medical bills incurred by him since October 2, 1966, as a result of the injuries, if any, sustained by him in the accident;

"(5) Any doctor, hospital or medical expenses which may be, with reasonable certainty, incurred by him in the future as a result of said injuries, if any;

"(6) Any expenses incurred by him for trips to hospitals and doctors since October 2, 1966, as a result of said injuries, if any.

"Taking into consideration these items, and if your verdict should be for the plaintiff it shall be your duty to award him such sum of money in your verdict as will fully justly and fairly compensate him for the injuries and damages he has sustained as a proximate result of the accident complained, but not to exceed $100,000.00 the amount sued for."

The jury was impaneled and sworn on Monday, June 9, 1969. The case was submitted to the jury on Tuesday, June 10, at 2:10 p.m. At 4:00 p.m., the jury returned into court and all the instructions were again read to the jury, after which it again retired to its room. At 4:55 p.m. on the same day, the jury returned into court and reported: "We are hung up six to six." The court then excused the jury until nine o'clock the next morning.

On Wednesday, June 11, at 9:00 a.m., the jury returned and commenced its deliberations. At 10:55 a.m., the court, upon its own motion and over the objection of counsel for both parties, gave the jury an instruction which is known as the "Allen" instruction, commonly called the "dynamite" instruction, which is as follows:

"Ladies and gentlemen of the jury, this is an important case. This trial has been long and tedious. The issues which you have before you will have to be decided by another jury in the event you are unable to agree. There is no reason to suppose that another trial of this case will not be equally long and tedious. You were selected in the manner and from the same source from which any jury must be selected, and there is no reason to believe that the case can ever be submitted to twelve people more intelligent, more impartial, or more competent to decide it. The court has no reason to believe that the case can again be tried any better or more exhaustively on either side. Of course, no juror should surrender his conscientious convictions, based upon the law and the evidence, merely for the sake of reaching a unanimous agreement, as any verdict reached must be that of each individual juror and not a mere acquiescence in the conclusions of his fellow jurors, but it is the duty of the jury to reach a verdict, if it can be done, without sacrifice of conscientious convictions. The jury room is no place for pride of opinion or stubbornness, and it is the duty of jurors to discuss the evidence with each other in a spirit of candor and fairness and with open minds, and each juror should give careful consideration and listen with the disposition to be covinced, to the views of his fellow jurors. No juror should enter the jury room with the blind determination that the opinion held by him should be the verdict of the jury.

"If very much the larger number of jurors are in agreement as to the particular verdict which should be made, a dissenting juror or those in the decided minority should carefully re-examine and weigh the evidence in the light of this fact, with a view to determining whether the considerations impelling his or their dissent are good and sufficient reason therefor, since such considerations did not affect the opinions and conclusions of so many other men equally intelligent, equally honest, and equally conscientious.

"Ladies and gentlemen, with these thoughts in mind, but with the admonition that your verdict must be unanimous and that no juror should surrender his own conscientious convictions merely for the sake of achieving unanimity, you are asked to resume your deliberations and earnestly endeavor to agree upon a verdict."

Whereupon the jury continued its deliberations and at 11:35 a.m. returned into court with the following verdict: "We the jury have decided the defendant, Church Bros., Inc. pay the plaintiff, Carlton Shields a sum of money in the amount of $940.88 to cover Wyoming General Hospital bill only. /s/ Fred Beavers, Foreman." The court then rewrote the verdict, which was signed by the foreman and approved by all of the jury, which reads as follows: "We the jury on the issue joined between the Plaintiff and the Defendant agree and find for the Plaintiff and assess his damage in the sum of $940.88. /s/ Fred Beavers, Foreman."

In the case of *Coakley v. Marple,* 152 W.Va. 68, 159 S.E.2d 378, the plaintiffs instituted an action to recover damages as a result of an automobile collision allegedly caused when the defendant drove his automobile into the rear of the plaintiff's automobile. Upon the trial of the case the jury returned a verdict in favor of Mrs. Coakley for $1,000, but refused any recovery to her husband. A motion to set aside the verdicts and judgment was overruled. Mrs. Coakley sought to recover damages to her automobile in the amount of $163.66 and for personal injuries. Mr. Coakley sought to recover the medical expenses incurred on behalf of his wife and for loss of consortium. He listed medical expenses in the amount of $834.20 and for additional household help, $520. There was a serious question as to whether the defendant was negligent. The plaintiff made a left turn at an intersection and claimed that she used her directional signal. The defendant, who hit her from the rear, claims that she stopped suddenly and gave no signal. This Court said [152 W.Va. 68, 76, 159 S.E.2d 378, 382-83]: "There was sufficient evidence in this record from which a jury

could have concluded that all of the disability of the plaintiff, Nina R. Coakley, did not result from the automobile collision with the vehicle of the defendant and furthermore that the treatment which she received subsequent to that time, and for which her husband was required to pay, was due to causes other than any injury sustained in the collision with defendant's automobile." The verdict in the sum of $1,000 for personal injuries and property damage could not, as a matter of law, be said to be inadequate because of the conflict of evidence as to the cause of disability for which the female plaintiff was treated after the accident.

The Court, in the *Coakley* case, affirmed the trial court in refusing to set aside the verdicts and judgment, and in the first point of the syllabus held:

> "In an action for damages for personal injury allegedly due to the negligence of the defendant, a verdict of the jury in favor of the plaintiff for a *nominal* amount will not be set aside on the ground of inadequacy where the evidence is such that if a verdict has been returned for the defendant the trial court could not have disturbed the verdict, inasmuch as such verdict must be considered as a finding for the defendant perversely expressed."

In the instant case both the plaintiff and Shiflett, the bulldozer operator, were experienced in the operation of bulldozers and the plaintiff had worked in timber for a number of years. Both thought the plaintiff was a safe distance away and both knew that such operation and activity could and might be dangerous; that accidents had occurred and injuries had resulted. The jury could very well, under this evidence, have found for the defendant and this Court would not be warranted in disturbing the verdict. See *Haffner v. Cross,* 116 W.Va. 562, 182 S.E. 573.

Of special significance in the instant case are the events leading up to the jury verdict after the case was submitted to them for decision. Their first report to the court, after

having deliberated less than two hours, during which time the eleven instructions of the court were again read to them, was: "We are hung up six to six." Thus six thought the plaintiff should prevail on the question of liability and an equal number thought the defendant not negligent. Thereupon the court excused the jury until the next morning, when, after about two hours of deliberation, it not having agreed, the trial court gave the "Allen" instruction heretofore quoted herein. After having heard the "Allen" instruction, the jury, within one-half hour, returned its verdict. We find that this verdict comes within the law laid down in the case of *Coakley v. Marple, supra,* especially as set out in the first point of the syllabus of that case, and that the verdict must be considered as a finding for the defendant perversely expressed.

The Court further stated in the second point of the syllabus of the *Coakley* case as follows:

> "In an action for damages for personal injury allegedly due to the negligence of the defendant, a *substantial* verdict for the plaintiff will not be set aside as inadequate unless the disparity between the amount of the verdict and the evidence makes it apparent that the verdict was not based upon the evidence but was a result of prejudice, partiality, passion or corruption on the part of the jury or that they were influenced in their conclusions by some mistaken view of the case."

The only expenses actually proven by the plaintiff were the Wyoming General Hospital bill in the amount of $940.88 and $100 expended for a hospital bed which no doubt had some salvage value. No attempt was made by the plaintiff to itemize the expenses incident to the several trips to Beckley and Mullens to see the doctors. There is nothing in the case to indicate that the verdict was not based upon the evidence, or that it was a result of prejudice, partiality, passion or corruption on the part of the jury or that the jury was influenced by some mistaken view of the case.

The trial court set aside the verdict of the jury and granted a new trial on the issue of the quantum of damages only, in a one sentence opinion, citing *England v. Shufflebarger,* 152 W.Va. 662, 166 S.E.2d 126, as his authority to do so. The only syllabus point in the *England* case reads as follows: " 'Rule 59 (a), R.C.P., provides that a new trial may be granted to any of the parties on all or part of the issues, and in a case where the question of liability has been resolved in favor of the plaintiff leaving only the issue of damages, the verdict of the jury may be set aside and a new trial granted on the single issue of damages. Syl. Pt. 4, *Richmond v. Campbell,* 148 W.Va. 595.' " In the *England* case the plaintiff and defendant were proceeding in a slowly moving line of traffic. The traffic preceding the plaintiff came to a halt, as did the plaintiff, and within a matter of seconds the plaintiff's truck was struck in the rear by the automobile operated by the defendant, Shufflebarger. The force of the collision was not great. The defendant's explanation of the accident was that she was momentarily blinded by sunlight and the vehicles "bumped". From reading the evidence detailed in the opinion, there is no question but that the defendant was guilty of primary negligence and the plaintiff was not guilty of contributory negligence.

In the case of *Richmond v. Campbell,* 148 W.Va. 595, 136 S.E.2d 877, where a new trial was awarded on the issue of damages only, the accident occurred while the plaintiff and defendant were on their way home from work, proceeding in the same direction, with the plaintiff riding on a small motor scooter in front of the defendant, and the defendant following in his automobile. The plaintiff started to turn into the driveway leading to his home, and the defendant, not being able to pass the motor scooter on the left because of an approaching automobile, applied his brakes but was unable to stop his vehicle. The defendant's vehicle struck the rear of the motor scooter, throwing the plaintiff onto the hood of the automobile, and then off onto the side of the road, seriously injuring him. Here, again, there is no question of liability; only

the question of the adequacy of the verdict. In this case the defendant conceded liability upon appeal.

In the case of *Hall v. Groves*, 151 W.Va. 449, 153 S.E.2d 165, the plaintiff obtained a jury verdict for damages, the amount of which he claimed was inadequate. This Court reversed the judgment of the trial court, set aside the verdict, and remanded the case with directions to grant the plaintiff a new trial on the single issue of the amount of his damages. The plaintiff sustained the damages while riding in the front seat with the defendant as a guest passenger. The defendant, suddenly and without any warning, drove the automobile off the public highway, across a sidewalk, and into a nearby lawn and then back upon the highway and upon and against a three-foot concrete abutment located on or near the right edge of the highway. The Court in the *Hall* opinion made the following statement [151 W.Va. 449, 456, 153 S.E.2d 165, 169]: "Under the undisputed evidence disclosed by the record the plaintiff, upon proper motion, would have been entitled to a directed verdict upon the issue of the liability of the defendant Groves. The question of liability under the evidence disclosed by the record is clearly separable and distinct from the question of damages; * * *."

An extensive annotation appearing in 85 A.L.R.2d at page 9 considers the subject of granting new trials on the separate issue of liability in tort actions. The following summary of court decisions appears in Section 7 at page 26: "The prime requisites for the limitation of a new trial in a tort action to the issue of damages, where such limitation is permissible under the local rules or practice, are (1) that the issue of damages be entirely separate and distinct from the issue of liability; (2) that the liability of the defendant be definitely established; and (3) that such limitation will not operate to the prejudice of the defendant. It has frequently been stated, furthermore, that the power to limit the new trial to the issue of damages must be exercised with caution, and it has been held that any doubt as to the propriety of such

limitation must be resolved against it." At pages 31 and 32 of the annotation, it is stated that "the limitation of the new trial to the issue of damages has been denied in some cases on the ground that the defendant might be able to produce evidence warranting a verdict or judgment in his favor."

For the reasons enunciated herein, we hold that the Circuit Court of Wyoming County erroneously set aside the verdict of the jury which must be considered as a finding for the defendant perversely expressed, and which was clearly within the province of the jury. Therefore, the judgment of the Circuit Court of Wyoming County is reversed, the verdict of the jury reinstated, and judgment for the plaintiff on the verdict is entered here by this Court.

*Judgment reversed; verdict for the plaintiff reinstated; judgment rendered by this Court.*